[Cite as *Hercules LED, L.L.C. v. Drabiski*, 2022-Ohio-4359.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

### HERCULES LED, LLC,

Plaintiff-Appellee,

v.

### JAMES DRABISKI,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 MA 0030**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2018 CV 2162

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Jeffrey A. Kurz,* 42 N. Phelps Street, Youngstown, Ohio 44503 for Plaintiff-Appellee
and

*Atty. Rhys Brendan Cartwright-Jones*, 42 N. Phelps Street, Youngstown, Ohio 44503 for
Defendant-Appellant.

Dated:  December 1, 2022

---

**Robb, J.**

{¶1}   Appellant, James Drabiski, appeals the trial court's February 22, 2021 decision finding him in breach of his settlement agreement with Appellee, Hercules LED, LLC, and awarding Appellee $30,000 in damages.  Appellant argues on appeal the trial court erred by interpreting the parties' agreement too broadly and Appellee should be precluded from enforcing the agreement because Appellee had "unclean hands" based on its failure to comply with the agreement.  For the following reasons, Appellant's arguments lack merit, and we affirm the trial court's decision.

## Statement of the Case

{¶2}   Appellee, Hercules LED, LLC, filed suit against Appellant in August of 2018 claiming Appellant, its former employee, was in violation of the noncompete agreement he signed while working for Appellee.  Appellee identified four causes of action:  breach of contract; tortious interference with business relationships; unjust enrichment; and declaratory relief and sought a temporary restraining order and permanent injunction prohibiting Appellant from violating the parties' agreement.  A copy of the agreement, executed in December of 2015, titled "Non-Compete and Confidentiality Agreement" is attached to the complaint.  It generally provides Appellant would not work for a competitor within a 100-mile radius of Appellee's business for a period of two years following his departure from his employment and Appellant would not contact, solicit, or interfere with Appellee's clients and customers during that time.  (August 16, 2018 Complaint.)

{¶3}   After the exchange of discovery, the case was set for a bench trial on October 11, 2018.  On the date of trial, the parties entered a settlement agreement.  The case remained pending, and two months later, Appellee filed a motion to enforce the settlement agreement.  In its motion, Appellee alleged Appellant violated the parties' agreement and sought liquidated damages as a result.  A copy of the settlement agreement is attached to the motion.  (December 11, 2018 Motion.)

{¶4}   Appellee's motion also claimed the settlement agreement was to be elaborated upon, but this never occurred.  Appellee alleged two violations.  It claimed Appellant violated the contract based on his sales efforts involving Liberty Township in

November of 2018 and his efforts to sell LED lighting to the Austintown U-Haul in December of 2018. The full extent of their agreement was attached to the motion and states:

SUMMARY OF NEGOTIATIONS

1. Jim's principal place of business is in Erie, PA.

2. Jim will not contact the existing customer base, which will be disclosed within 15 days.

3. Jim, of course, may sell whatever non-LED product to whomever, wherever.

4. Jim will not sell LED to any entity w/in a 40-mi radi[u]s of Hercules, Boardman, OH, H.Q. for 12 months commencing July 3, 2018, save for currently existing clientele of an entity for whom Jim works.

5. This does not constrain any other Winkle sales people in their presently existing territory.

6. Liquidated damages in the event of breach in the amount of $15k.

7. $5,000.00 w/in 30 days as a "penalty."

8. Court costs to be paid by Defendant.

(December 11, 2018 Motion, Ex. A.)

{¶5} The motion to enforce was heard at an April 30, 2019 bench trial before a magistrate. The trial testimony confirms the following. Appellant, James R. Drabiski, testified first on cross-examination. He acknowledged working for his new employer, Winkle Electric, since July of 2018. He agreed he signed the 2015 non-compete agreement with Hercules and left his employment with Hercules the same month he started at Winkle. Winkle is about seven miles away from Hercules. While with Hercules, he was trained in its sales technique and routine and was also taught their sales system. (Tr. p. 16-18.) Drabiski confirmed he signed the settlement agreement at issue in the motion to enforce.

{¶6} Drabiski agreed he had a laptop while at Hercules which contained his sales presentation. He took his laptop with him when he left his employment with Hercules. When asked if he sells lighting, Drabiski said: "I don't sell lighting. I just assist my * * * colleagues at work." (Tr. 25.)

{¶7}    Regarding one of the two alleged breaches, Liberty Township, Drabiski agreed he was present in Liberty Township in November of 2018.  He denied knowing Liberty Township was a client of Hercules LED, but he did agree the township was within a 40-mile radius of Hercules' Boardman, Ohio address.  Drabiski said he went there "to answer some warranty questions" because his boss was out of town.  He denied knowing he was sent there to submit a proposal to the township for LED lighting.  (Tr. 26-28.)

{¶8}    Regarding the other breach involving U-Haul, Drabiski acknowledged there was a new location in Austintown and it was within 40 miles of Hercules' Boardman, Ohio address.  Drabiski recalls going there, but denied knowing the date of his visit.  (Tr. 28.)  When asked about the purpose of his visit to U-Haul, the following exchange occurred:

A.  I was there on a ride-along with another sales rep who had asked me a question he had about a light, and he asked me to ride past and let him know what the proposal of a ration on a certain parking lot would be.

Q.  Okay.  So you were there with another salesman from Winkle Electric.

A.  Yes.

Q.  And at the time, the purpose of you and that salesman being there was to complete a sale to the U-Haul location on Mahoning Avenue; is that correct?

A.  Not on my case, no.  I don't know what he was doing there.

Q.  You have no idea why you would be riding with a salesman from Winkle Electric going to a sales call * * *?

A.  Well, he had prior – he was priorly involved with U-Haul.  He asked me to ride along to support.  * * * I don't want to say why he was there for sure because that would be putting words in his mouth.

(Tr. 29-30.)

{¶9}    When presented with the sales and energy saving proposal prepared on behalf of U-Haul by Winkle, Drabiski said he was not involved with the energy saving calculations that went into this proposal or the lighting inventory to be used.  But Drabiski acknowledged he was with his Winkle co-worker the day he presented the Winkle proposal to U-Haul.  Drabiski also testified he spoke with a U-Haul representative over

the phone, but he referred the man from U-Haul to another Winkle salesman. The following exchange occurred:

Q. * * * when you sell, would you agree that that's just not saying, give me money, right?

A. No.

Q. It's part of a process, right?

A. Yes.

Q. And part of that process is providing proposals, correct?

A. Yes.

Q. And part of that process is doing an energy savings calculation, correct?

A. Correct.

Q. Part of that process is doing an inventory of making – of the place that you were going to sell a bid to, right?

A. That's correct.

Q. Part of the selling process is providing a bid, right?

A. That's correct.

Q. And part of that process is walking in and saying, this is what we can save you, right?

A. That's correct.

Q. And then, also part of that process is getting the actual contract signed, right?

A. That's correct.

(Tr. 34-36.)

**{¶10}** Thereafter, upon questioning by his counsel, Drabiski agreed he did not "on his own" "initiate and complete a sales process" on behalf of Winkle. But Drabiski likewise agreed he "might have been there as tangential or tertiary support for a couple of parts of the sales process * * *." He did not earn a commission from U-Haul or Liberty Township and denied knowing either was an existing client of Hercules. Drabiski testified he did not receive an "existing customer list" from Hercules after entering into the settlement agreement. (Tr. 36-38.)

Case No. 21 MA 0030

{¶11} Thereafter, Robert Maloney of U-Haul testified he has been with the Austintown, Ohio location since it opened and confirmed it did not have an existing or prior business relationship with Winkle Electric. Maloney called Winkle seeking a quote to update its outdoor lighting, and in response, Drabiski and Mike Gagne came out to view the property. Their visit resulted in Winkle submitting a bid to update U-Haul's lighting. He recalls Drabiski counting the lights and explaining the paperwork to him. Drabiski went over the proposal with him and informed him of the benefits of signing the Winkle sales contract. Maloney agreed Drabiski attempted to sell him LED lighting. Maloney said the post-visit emails and calls regarding the Winkle proposal were performed by Gagne, Drabiski's co-worker. (Tr. 57-60.)

{¶12} Jerry Brown, a Hercules employee and salesman, testified he has worked for Hercules for about three years and he had previously worked with Appellant during his time at Hercules. Brown was trained in Hercules' sales technique and confirmed the Hercules customer list is a file saved on a salesperson's laptop. Before Drabiski left his employment with Hercules, Brown recalls working on a sales proposal in an effort to sell LED lighting to Liberty Township. Drabiski may have helped Brown with the bid. And after Drabiski left his employment with Hercules, Brown saw him at a Liberty Township board meeting at which Drabiski was representing his new employer, and during the meeting, the township reviewed the companies' competing lighting proposals. (Tr. 63-68.)

{¶13} After the bench trial, the magistrate found in favor of Appellant and concluded he was not in violation of the settlement agreement and overruled Appellee's motion to enforce. The magistrate concluded in part that although Appellant attempted to complete two sales in violation of the agreement, because he did not actually complete the transaction and his efforts did not culminate in a sale, he was not in violation of the agreement since "[i]t does not prohibit him from *attempting* to sell said lighting." (Emphasis sic.) (August 12, 2019 Magistrate's Decision.)

{¶14} Appellee filed numerous objections to the magistrate's decision, which Appellant opposed. (August 20, 2019 Objections to the Magistrate's Decision; September 9, 2019 Opposition to Objections.) The trial court subsequently granted Appellee's objections. The court found Appellant had twice violated the parties' settlement

agreement by engaging in the selling process during the restricted time and within the geographic parameters detailed in their agreement, and pursuant to the agreement, the court awarded Appellee $30,000 in damages. (February 22, 2021 Judgment Entry.)

**{¶15}** Appellant appealed and raises one assignment of error.

## Law & Argument

**{¶16}** Appellant's sole assigned error asserts:

"The trial court erred in overruling the magistrate's decision and in directing that James Drabiski breached a settlement agreement that affected a covenant not to compete."

**{¶17}** Appellant's assignment of error consists of two arguments. First, he argues the trial court interpreted the agreement too broadly. Second, he contends the court erred by enforcing the settlement agreement against Appellant when Appellee breached it by not providing its client list. Appellant does not challenge the damages award or whether the alleged violations occurred during the restricted time or within the geographic parameters detailed in the agreement, and as such, we do not analyze these aspects of the court's decision. App.R. 12(A)(1)(b) (court of appeals shall determine the appeal on the merits on the assignments of error).

**{¶18}** To prove a breach of contract claim, "the plaintiff must prove the existence of a contract, the plaintiff's performance under the contract, the defendant's breach, and damages." *Mentor Exempted Village School Dist. Bd. of Edn. v. Lake Cty. Educational Serv. Ctr. Governing Bd.*, 2016-Ohio-7649, 74 N.E.3d 706, ¶ 83 (11th Dist.).

**{¶19}** Appellate courts generally review a trial court's judgment from objections to a magistrate's decision for an abuse of discretion; however, the applicable standard depends on the nature of the underlying matter. *Harrison v. Lewis*, 9th Dist. Summit No. 28114, 2017-Ohio-275, ¶ 40. If the issue on review concerns a matter of law, then we review the matter de novo. *Lucas v. Ford Motor Co.*, 2018-Ohio-3765, 109 N.E.3d 1287, ¶ 16 (9th Dist.); *Stephan Business Ents., Inc. v. Lamar Outdoor Advertising Co.*, 1st Dist. Hamilton No. C-070373, 2008-Ohio-954, ¶ 12-13. Because a settlement agreement is a contract, it presents an issue of law reviewed de novo, and the referral of the matter to a magistrate does "not circumvent an appellate court's de novo review." *Lamar, supra,*

citing *Long v. Noah's Lost Ark, Inc.*, 158 Ohio App.3d 206, 2004-Ohio-4155, 814 N.E.2d 555, ¶ 17-18 (7th Dist.).

**{¶20}** Yet, where the question at issue is factual or evidentiary, we will not overturn the trial court's finding if there was sufficient evidence to support it. *Chirchiglia v. Ohio Bur. of Workers' Comp.,* 138 Ohio App.3d 676, 679, 742 N.E.2d 180 (7th Dist. 2000). To the extent an issue hinges on credibility, we defer to the trial court's judgment because issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the factfinder. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 81, 461 N.E.2d 1273 (1984).

**{¶21}** As stated, Appellant first contends the trial court erred by interpreting the word "sell" too broadly. Instead, he urges us to find Ohio law governing non-compete agreements dictates a narrow construction in furtherance of professional mobility and he did not violate the agreement because he did not technically complete a sale. For the following reasons, this argument lacks merit.

**{¶22}** Although restrictive covenants are not generally favored under the law, the Ohio Supreme Court has "'long recognized the validity of agreements that restrict competition by an ex-employee if they contain reasonable geographical and temporal restrictions. * * * Such an agreement does not violate public policy, 'being reasonably necessary for the protection of the employer's business' if they are 'not unreasonably restrictive upon the rights of the employee.'" *Lake Land Emp. Group of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 2004-Ohio-786, 804 N.E.2d 27, ¶ 9, quoting *Briggs v. Butler,* 140 Ohio St. 499, 507-508, 45 N.E.2d 757 (1942).

**{¶23}** In interpreting the terms of a covenant not to compete, Ohio courts apply the same rules of construction used in construing any contract. *Berk Ents., Inc. v. Polivka*, 11th Dist. Trumbull No. 2012-T-0073, 2013-Ohio-4961, ¶ 35, citing *Case v. Case,* 12th Dist. Butler No. CA2001-04-075, 2001 WL 1302128 (Oct. 29, 2001). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the contract, and common words will be given their ordinary meaning unless manifest absurdity results or some other meaning is clearly evidenced from the face or overall content of the instrument." *Berk,* citing *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.,* 78 Ohio St.3d 353, 361, 678 N.E.2d 519 (1997).

"The purpose of contract construction is to effectuate the intent of the parties," and that intent "is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 132, 31 OBR 289, 509 N.E.2d 411. Courts resort to extrinsic evidence of the parties' intent "only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning." *Id.* The fact that the parties fail to specifically define a term within the contract does not make the term ambiguous. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684. Instead, common, undefined words appearing in a written instrument "will be given their ordinary meaning unless manifest absurdity results, or some other meaning is clearly evidenced from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph two of the syllabus.

*State ex rel. Petro v. R.J. Reynolds Tobacco Co.*, 104 Ohio St.3d 559, 2004-Ohio-7102, 820 N.E.2d 910, ¶ 23-24.

**{¶24}** The settlement agreement provides in part: "4. Jim will not sell LED to any entity w/in a 40-mi radi[u]s of Hercules, Boardman, OH, H.Q. for 12 months commencing July 3, 2018, save for currently existing clientele of an entity for whom Jim works." (December 11, 2018 Motion, Ex. A.)

**{¶25}** *Black's Law Dictionary* defines "sell" as "[t]o transfer (property) by sale." *Sell*, (11th ed. 2019). Whereas the *Merriam-Webster Dictionary* provides multiple definitions for the word and defines "sell" in part:

7a: to cause or promote the sale of

// using television advertising to *sell* cereal

b: to make or attempt to make sales to

c: to influence or induce to make a purchase * * *.

(Emphasis sic.) https://www.meriam-webster.com/dictionary/sell (accessed July 14, 2022).

{¶26} Upon examining the settlement agreement as a whole, the intent of the parties was to prohibit Appellant from engaging in any sales activities or conduct attendant to selling LED, including but not limited to contacting customers, soliciting sales of LED for co-workers, communicating sales presentations, and the like. We come to this conclusion when reviewing the contract as a whole, including the initial statement that Appellant's principal place of business with his new employer is Erie, Pennsylvania; the references to Appellant agreeing not to contact existing Hercules' customers; and the contract's statement indicating it is not intended to prohibit Appellant's co-workers and employer from engaging in sales activities within the agreed upon 40-mile radius.

{¶27} The narrow interpretation of "sell" and the result which Appellant advances is not a reasonable construction of the parties' agreement and is not evidenced from the overall content of the agreement. The agreement explicitly states Appellant's Winkle co-workers could still sell LED within that area, but Appellant agreed not sell in the 40-mile radius. This acknowledgment coupled with the ordinary and usual meaning of the word "sell" shows the parties agreed Appellant would not promote the sale of LED on behalf of his new employer; would not attempt to make sales of LED; and would not influence or induce others to purchase LED within the prohibited area. The narrow reading Appellant urges us to adopt will lead to an absurd result, i.e., it allows Appellant to participate in all the sales activity, including promoting his new employer's LED over that of his prior employer's LED, and only precluding Appellant from completing the final transaction during which contracts are signed, money is handed over, and goods and services are delivered.

{¶28} Upon employing the common meaning of the word "sell" to include the entire sales process, we conclude Appellant violated the agreement twice during the one-year period under the settlement agreement with Appellee when he participated in the sales process and attempted to sell LED lights to Liberty Township and U-Haul on behalf of his new employer. His efforts to promote and sell LED contrary to the settlement agreement is the violation; whether his efforts were ultimately successful and his name was on a bill of sale or sales contract as the salesmen earning a commission is of no consequence.

{¶29} Unlike the instant case, the Eleventh District Court of Appeals in *Berk v. Polivka* found the noncompete clause at issue before it was not violated. Instead, Polivka

was essentially taking preparatory steps to compete with his then-employer once his one-year non-compete clause expired. Polivka was not competing with Berk during the prohibited period but was getting ready to do so by setting up his own business without actually engaging in the prohibited competitive conduct. *Id.* at ¶ 46.

**{¶30}** Unlike *Berk*, however, the evidence here shows Appellant actively participated in sales efforts including explaining proposals, counting lights, and communicating sales benefits during the prohibited period. Whether or not U-Haul or Liberty Township eventually purchased the LED lighting from Winkle or his co-worker is not determinative.

**{¶31}** Because Appellant violated the parties' settlement agreement by engaging in sales activities and attempting to sell LED, he violated the agreement. Thus, the first argument under Appellant's first assigned error lacks merit and is overruled.

**{¶32}** As for Appellant's second argument, he claims the trial court erred by enforcing the settlement agreement against him because Appellee had "unclean hands" and breached the agreement by not providing its client list to Appellant as required under the parties' settlement agreement.

**{¶33}** As argued, Appellee was required, per line two of the parties' agreement, to provide its client list within 15 days. Consistent with this argument, during opening statements, Appellant's counsel argued Appellee should not be able to enforce the agreement against him because Appellee had "unclean hands" based on its failure to provide him with this list.

**{¶34}** However, Appellee argued Appellant already had Hercules' client list on his laptop, which he used during his employment with Hercules and Appellant kept this laptop when he left his employment with Hercules.

**{¶35}** Brown testified Hercules' salespeople stored these lists on their laptops. (Tr. 65.) Appellant confirmed he retained his laptop upon leaving his employment from Hercules, even though he also testified Hercules never provided him with its "existing" client list. Thus, there was evidence tending to show Appellant was in possession of the client list after his departure from his employment.

**{¶36}** Regardless, and despite the fact the parties' settlement agreement required the disclosure of Hercules' client list within 15 days, the agreement does *not* make

Appellant's compliance with his obligations under line number four contingent upon Hercules' disclosure of the list, set forth in line two. To the contrary, per item number four, the agreement prohibits Appellant from "sell[ing] LED to any entity w/in a 40-mi radi[u]s of Hercules, Boardman, OH, H.Q. for 12 months commencing July 3, 2018, save for currently existing clientele of an entity for whom Jim works." (December 11, 2018 Motion to Enforce, Ex. A.) This promise is independent of and in addition to Appellant's agreement not to contact Hercules' customers set forth on its customer list, as detailed in item number two.

**{¶37}** Further, Appellant's alleged lack of knowledge as to who was or was not an existing Hercules' customer is irrelevant for this reason. Consequently, Appellant's second argument lacks merit. The trial court correctly enforced the terms of the settlement agreement and found Appellant in violation.

## Conclusion

**{¶38}** For the following reasons, both arguments under Appellant's sole assignment of error lack merit. The trial court was correct in its interpretation of the parties' settlement agreement, and Appellee's apparent failure to provide its client list per the agreement did not affect Appellant's independent obligations not to compete as detailed in their settlement agreement. Accordingly, the trial court's judgment is affirmed.

Waite, J., concurs.

D'Apolito, J., concurs.

Case No. 21 MA 0030

_____

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**